UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 5118

-----------------------------------------------------------------X

ETERNITY MARITIME CORPORATION,
PTE. LTD. and CRUMBLE TRADING CORP.,

                    Plaintiffs,

    - against -

PROJECTOR S.A.,

                    Defendant.

-----------------------------------------------------------------X

RECEIVED
JUN 0 4 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiffs, ETERNITY MARITIME CORPORATION, PTE. LTD. (hereinafter "Eternity Maritime") and CRUMBLE TRADING CORP. (hereinafter "Crumble Trading") (hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys, Lennon, Murphy & Lennon, LLC, as and for their Verified Complaint against the Defendant, PROJECTOR S.A. (hereinafter "Projector" or "Defendant") allege, upon information and belief, as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331.

2.     At all times material to this action, Eternity Maritime was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Singapore.

3.     At all times material to this action, Crumble Trading was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Liberia.

4.    Upon information and belief, Projector was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Belize.

5.    By a charter party dated July 31, 2007, (hereinafter "the charter party") Eternity Maritime voyage chartered the vessel "M/T Axinos" (hereinafter "the Vessel") to Projector on the Asbatankoy form with amendments and additional terms for the carriage of gasoline from loading ports of either Antwerp, Rotterdam or Amsterdam and discharging port of one, two or three safe port(s) West Africa (Dakar-Douala Range), excluding Liberia and any other United Nation banned countries. *A copy of the charter party recap is attached hereto as Exhibit 1. A copy of the typed out charter party and additional clauses is attached hereto as Exhibit 2.*

6.    During the course of the charter, Crumble took ownership of the Vessel and also took over the charter from Eternity Maritime, with the knowledge and consent of Projector.

7.    On August 9, 2007, the Vessel arrived at the load port of Amsterdam and tendered its Notice of arrival and awaited for the laydays[1] to commence. *A copy of this notice is attached hereto as Exhibit 3.*

8.    The total laytime[2] used at the load port was 1 day, 14 hours and 12 minutes.

9.    On route to the discharge port, the Vessel deviated on the instructions of Projector to Lome to discharge part of its cargo.

10.    While the Vessel was at Lome, Projector exhausted the entire available laytime provided for in the charter party. The Vessel was on demurrage[3] for 11 days, 1 hour, and 42 minutes.

---

[1] Laysdeys refers to the days allowed for cargo operation in a charter party.

[2] Laytime refers to the time allowed by the shipowner to the voyage charterer in which to load and/or discharge the cargo.

[3] Demurrage is a fixed sum, per day or per hour, agreed to be paid for the detention of the vessel under charter at the expiration of laytime allowed.

2

11.     On September 13, 2007 at 10:00 hours, the Vessel arrived at the second discharge port of Lagos and tendered its notice of readiness. The Vessel was on demurrage at Lagos due to problems with the cargo.

12.     The charter party provided for demurrage at the rate of $20,000.00 per day. *See Exhibit 1.*

13.     The Vessel was on demurrage at Lome and Lagos for a total of 52 days, 17 hours and 16 minutes. *A copy of Crumble's laytime/demurrage statements for the load and discharge ports is attached hereto as Exhibit 4.*

14.     On October 26, 2007, Crumble served on Projector a final demurrage invoice for the sum of $53,019.17 after taking into account interim demurrage payments already made by Projector. *A copy of the final demurrage invoice is attached hereto as Exhibit 5.*

15.     To date, Projector has refused and/or failed to pay the outstanding demurrage due under the terms of the charter party.

16.     Projector has breached the terms of the charter party by refusing and/or failing to pay outstanding demurrage due and owing to Plaintiffs.

17.     Plaintiffs intend to proceed with English High Court proceedings against Defendants.

18.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiffs' claims and in aid of English High Court proceedings.

19.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law.

20.     As best as can now be estimated, Plaintiffs expect to recover the following amounts as the prevailing party:

a.      Plaintiffs' Principal Claim:                                    $   53,019.17

*Unpaid Demurrage*

| | | | |
|---|---|---|---|
| b. | Interest for 2.5years, compounded quarterly at 8%: | $ | 9,101.24 |
| c. | Estimated recoverable legal fees and costs: | $ | 15,000.00 |
| **Total:** | | **$** | **77,120.41** |

21.     The Defendant cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules

of Civil Procedure, but, upon information and belief, Defendant has, or will have during the

pendency of this action, assets within this District and subject to the jurisdiction of this Court, held

in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

22.     The Plaintiffs seek an order from this court directing the Clerk of Court to

issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any proeprty of the

Defendant held by any garnishee within the District for the purpose of obtaining personal

jurisdiction over the Defendant, and to secure the Plaintiffs' claims as described above.

**WHEREFORE,** Plaintiffs pray:

A.     That process in due form of law issue against the Defendant, citing it to appear and

answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court

recognize and confirm any foreign judgment rendered on the claims had herein as a Judgment of

this Court;

C.     That since the Defendant cannot be found within this District pursuant to

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an

Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims,

4

attaching all tangible or intangible property of the Defendant within the District, including but not limited to any funds held by any garnishee, which are due and owing to the Defendant, up to the amount $ 77,120.41 to secure the Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.     That this Court enter Judgment against Defendant on the claims set forth herein;

E.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.     That this Court award Plaintiffs their attorney's fees and costs of this action; and

G.     That the Plaintiffs have such other, further and different relief as the Court may deem just and proper.

Dated: June 4, 2008
Southport, CT

> The Plaintiffs,
> ETERNITY MARITIME CORPORATION and
> PTE. LTD., CRUMBLE TRADING CORP.
>
> By: _Anne C. LeVasseur_
>
> Patrick F. Lennon
> Anne C. LeVasseur
> LENNON, MURPHY & LENNON, LLC
> 420 Lexington Ave., Suite 300
> New York, NY 10170
> (212) 490-6050 – phone
> (212) 490-6070 – fax
> pfl@lenmur.com
> acl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                )   ss.:   Town of Southport.
County of Fairfield )

1.     My name is Anne C. LeVasseur.

2.     I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.     The reason why this Verification is being made by the deponent and not

by the Plaintiffs is that the Plaintiffs are a business organization with no officers or directors now within this District.

6.     The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiffs.

Dated:    Southport, CT
           June 4, 2008

Anne C. LeVasseur

6

EXHIBIT 1

EXHIBIT 1

Print Copy for : PLASTIRA AIKATERINI
_____

SENT OK Inc.MSG.: 179987        Date: Wed 01/Aug/2007 13:45
From: Gibson E.A. Tankers <"E A Gibson Ltd. - Clean" <clean@eagibson.co.uk>>
Subject: axinox - full recap ** MSG#:<124837>
TO : <tops@eagibson.co.uk>, <chartering@imssa.gr>


AMMENDED RECAP
==============

EA GIBSON HERE 01 AUG 2007
==========================
WITH YOUR AUTHORITY I AM PLEASED TO CONFIRM THE FOLLOWING FIXTURE WITH ALL
SUBJECTS IN ORDER:-

STRICTLY PRIVATE & CONFIDENTIAL
===============================
HEAD OWNERS: Eternity Maritime Corporation Pte.Ltd
Tech Operator ::I M S S.A.
      Aitolikou 6-8 and Xestoros Str., 18545 Piraeus / Hellas
      E-mail: chartering@imssa.gr - info@imssa.gr
      Phone : +30210 4140700 - 4588100
      Fax   : +30210 4133156 - 4183293

COMMERCIAL MANAGERS   : :I M S S.A.
      Aitolikou 6-8 and Kastoros Str., 18545 Piraeus / Hellas
      E-mail: chartering@imssa.gr - info@imssa.gr
      Phone : +30210 4140700 - 4588100
      Fax   : +30210 4183156 - 4183293

PERSON IN CHARGE : Mr Panagiotis Kourkoumelis - dir line: +30 210 45 89 115
                                                          mob:    +30 6937
45 69 46
OPERATOR    :AS ABOVE

CHARTERERS : PROJECTOR S.A OF BELIZE

BROKER : EA GIBSON SHIPBROKERS LTD
                  ADAM TOALE + 44 20 7667 1129

CHARTER-PARTY FORM:   ASBATANKVOY
CHARTERPARTY DATED : 31 July 2007

PART I

(A)

VESSEL:     M/T AXINOS  (ex ENDURANCE)
SDWT:       39,998 MT
DRAFT:      12.1405 M
BUILT:      3/1988
FLAG:       SPORE
LOA:        185.9 M
BEAM:       27.43 M
KTM:        46.2 M
BCM:        92.2 M
TPC:        44.84 MT
CAPACITY:   45,125.6 M3 98% EXCL SLOPS
            SLOP TANK CAPACITY 2,182.78 CUBIC MTRS
COATED:     YES - EPOXY

```
COILED:      NO
IGS:         YES
SBT:         YES
HULL TYPE:   DOUBLE SIDED
SPD:         ABT 12.50 KNOTS WSNP AND CP TO 4BF SCALE
```

LAST THREE CRGS:   LMS/UMS/GO

IS VSL EX LAY UP:   NO
IS VSL EX DRYDOCK:  NO

MAJOR APPROVALS/EXPIRY: NONE

LAST SIRE INSPECTION: NONE

HAS VESSEL BEEN INVOLVED IN ANY COLLISION, GROUNDING OR
POLLUTION INCIDENT THE PAST 12 MONTHS: NO

                 VESSEL POSITION AND ITINERARY
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
(B) PRESENT POSITION/ITINERARY:  VESSEL SAILED LAGOS 20TH JUL

ETA ESS AMSTERDAM 9-10 AUG 2007 AGW, WSNP

                      DATES
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
(C) LAYDAYS COMMENCING : 13 aug 2007
               CANCELLING : 15 aug 2007

                 GEOGRAPHICAL
--++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
(D) LOAD PORT(S)/RANGE:  1-2 SAFE PORTS ARA

(E) DISCH PORT(S)/RANGE: 1-3 SAFE PORTS WEST AFRICA DAKAR-DOUALA
                         RANGE EXCL LIBERIA AND ANY OTHER U.N.
                         BANNED COUNTRIES.

                 CARGO DESCRIPTION
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
(F) CARGO DESCRIPTION: MIN 33000 MT CROPT UPTO FULL CARGO 1/2 GRADES
                       UNDYED UNLD CPP/GASOLINE BLENDSTOCK UND 2.5 NPA
                       WWMS, MIN SG 0.74 AT LT. EXCL PURE MTBE

CHRTRS HAVE THE OPTION TO LOAD ONE GRADE GASOIL (MIN SG .84)

        HEAT : N/A

        OVERAGE : 50 PCT UP TO 33,500
                        ABOVE 33,500 MT 100% OF FREIGHT RATE.

                 FINANCIAL
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
(G) FREIGHT RATE(S)  WS 185

(I) LAYTIME:      84 HOURS

(J) DEMURRAGE:    USD 20,000 PDPR

(K) COMMISSION(S):  1.25 PCT ADDRESS, 1.25 NAVIG8 EUROPE LTD PLUS 1.25 EA
GIBSON
SHIPBROKERS LTD. PLUS 1.25 TO IMS

(L) SPECIAL PROVISIONS: PORT COSTS - MAX USD 15,000 O/AS AT DISPORT
                        CHTRS OPTION TO PAY PORT COSTS DIRECT AND USD

15,000 TO BE DEDUCTED FROM FREIGHT

1)  OWNER CONTACT INFORMATION

MANAGERS  : I M S S.A.
     Aitolikou 6-8 and Kastoros Str., 18545 Piraeus / Hellas
     E-mail: chartering@imssa.gr - info@imssa.gr
     Phone : +30210 4140700 - 4583100
     Fax   : +30210 4183156 - 4183293

OPERATOR  : AS ABOVE

2)   CHARTERERS CONTACT INFORMATION (PLSE ADV IF STILL VALID)

OPERATION CONTACTS:
OFFICE TELEPHONE NUMBER - +44 207 659 9500
OFFICE FAX NUMBER - +44 207 659 9501
E-MAIL: OPSDESK@PROJECTOPSERVICES.CO.UK
TELEX: 94079808 PROJG

OPERATOR: MR RICHARD HUTTON
OFFICE PHONE NUMBER -   + 44 207 659 9519
MOBILE NUMBER -  + 44 7798 618674 .

SECONDARY 24 HR CONTACT:  YACINE KETANI
                                                              MOBILE : + 44 7919
377608

3) OWNERS WARRANT VESSEL CAN SBM ON PORT AND STARBOARD SIDES

4) IF STS NO DISBURSMENTS FOR OWNERS ACCOUNT

5) CHARTS AGENT BOTH ENDS

6) WSTC

7) MAX 3 HRS AWAITINGS CARGO DOCS AFTER COMPL OF DISCH FOR OWNS ACCT

8) TAXES DUES ON FREIGHT A/O CGO TO BE FOR CHARTS ACCT AND SETTLED
DIRECTLY BY
THEM

9) OWNERS ADDITIONAL CLAUSE
IN-TRANSIT LOSS CLAUSE OWNS WILL BE RESPONSIBLE FOR THE FULL AMOUNT OF
ANY
INTRANSIT LOSS EXCEEDS 0.5 PCT AND CHARTS SHALL HAVE THE RIGHT TO
CLAIM AN
AMOUNT EQUAL TO THE FOB PORT-OF-LOADING VALUE OF SUCH CGO PLUS FRT DUE
WITH
RESPECT THERETO. IN TRANSIT LOSS IS DEFINED AS THE DIFFERENCE BETWEEN
VSSLS
VOLUME AFTER LOADING AT THE LADING PORT AND BEFORE UNLOADING AT THE
DISCHARGING
PORT. PUMPABLE CARGO SHALL NOT CONSTITUTE AN ACTUAL LOSS. IN TRANSIT
LOSS IS
APPLICABLE PROVIDED ULLAGES ARE TAKEN ALONGSIDE BY SHORE BASED BERTH
AT
LOAD/DISPORT'

10) WEST AFRICA CLAUSE
--------------------
-RE: NIGERIAN CERTIFICATE OF COMPLIANCE. CHARTRS TO ARRANGE FOR SAME
AT THEIR
TIME AND EXPENSE. SHOULD ANY DELAYS BE INCURRED SAME TO BE FOR CHRRS

ACCOUNT.
-ANY TIME AWAITING NAVAL CLEARANCE TO BE FOR CHRRS ACCOUNT.
-ANY DELAYS IN OBTAINING NIGERIAN TASK FORCE PERMISSION TO ENTER
NIGERIAN
WATERS TO COUNT IN FULL AS USED LAYTIME OR DEMURRAGE, IF ON DEMURRAGE.
-NMA FEE, IF IMPOSED, NOT TO BE FOR OWNRS ACCOUNT. CHRRS ARE TO BE
RESPONSIBLE
FOR THE NMA APPROVALS.
-ANY DELAY IN NIGERIAN/W.AFRICA IN BERTHING, DISCHARGING OR SAILING
DUE TO
STRIKES, BAD WEATHER, LOCKOUTS, RESTRAINTS, WORK-TO-RULE, GO SLOW AND
OF OTHER
CAUSE OVER WHICH OWNERS / MASTER / CREW / HAVE NO CONTROL TO COUNT AS
LAYTIME
OR DEMURRAGE IF ON DEMURRAGE AND EXPENSES SO INCURRED IF ANY TO BE FOR
CHRRS
ACCOUNT.
-UNDISPUTED DEMURRAGE INCURRED AT WEST AFRICA DISCHARGE PORT / PORT(S)
TO BE
PAID EVERY 10 DAYS IN ARREARS , FINAL PORTION WHEN SETTLING THE
ACCOUNTS


PROJECTOR VOYAGE CHARTERING TERMS, DATED 15 APRIL 1999 AMENDED 24 MAY
2004
------------------------------------------------------------------------
----

CL 1.    GENERAL TERMS.

         A. OKAY
         B. OKAY
         C. 84 HRS SHINC
         D. OKAY
         E. OKAY
         F. OKAY
         G. OKAY
         H. PANDI 'WEST OF ENGLAND'

CL 2.    AMENDMENTS TO THE ASBATANKVOY

         A)    AMENDMENT TO PART I, ITEM K    -OKAY

         B)    AMENDMENT TO PART I, ITEM L    -OKAY

         C)    AMENDMENT TO PART II, CLAUSE 1  -OKAY

         D)    AMENDMENT TO PART II, CLAUSE 5  -DELETE AND INSERT 'SHLD
OWNERS
               BECOME AWARE THAT VSL WILL MISS HER CANCELLING DATE THEN
OWNERS TO
               ADV CHRTS OF NEW REQUIRED LAYCAN AND CHARTS TO DECL
WITHIN 2
               WORKING DAYS TO MAINTAIN OR CANCEL THE

         E)    AMENDMENT TO PART II, CLAUSE 6. -OKAY

        · F)   AMENDMENT TO PART II, CLAUSE 7.

         G)    AMENDMENT TO PART II, CLAUSE 8. -ADD AT END 'TIME LOST TO
BE SPLIT
               50/50 BETWEEN CHARTS AND OWNERS'

         H)    AMENDMENT TO PART II, CLAUSE 9. -DELETE

I) AMENDMENT TO PART II, CLAUSE 12 -DELETE

J) AMENDMENT TO PART II, CLAUSE 20(B)(III)

K) AMENDMENT TO PART II, CLAUSE 24

CL 3. BILL(S) OF LADING/INDEMNITY CLAUSE.
DELETE SUB PARA 1 TO 8 AND INSERT 'AGAINST LOI AS PER OWNERS PANDI
WORDING WITHOUT BANK SIGNATURE'

CL 4. POSITION CLAUSE

CL 5. ADDRESS COMMISSION.

CL 6. WEATHER CLAUSE.
ADD AT THE END 'UNLESS SEA BUOYS SPM/SBM/STS/OPEN TERMINALS SEALINES
OR
IF SWELL IS MAKING OPERATION UNSAFE THEN TIME TO COUNT IN FULL'

CL 7. THIRD PARTY ARREST CLAUSE.
LINE 3 DELETE 'AND CONSEQUENCES' AND AFTER 'ARREST' INSERT 'DUE TO
OWNS
BREACH OR ANY FAULT OF OWNS'

CL 8. LAW AND LITIGATION CLAUSE.

CL 9. CLAIMS CLAUSE.
2ND LINE DELETE 'SUCH AS BUT NOT LIMITED TO'

CL 10. OVERAGE INSURANCE.
DELETE - VESSEL FREE OF ANY OVERAGE INSURANCE.

CL 11. WAR RISK CLAUSE .
4TH LINE DELETE 'OWNS' AND INSERT 'CHARTS '5TH LINE DELETE IN FULL ADD
AT
THE END 'EXTRA WAR RISK INSURANCE TO BE PAID TO OWNERS AGAINST OWNERS
INVOICE,
ANY REBATE OBTAINED TO BE PASSED TO CHARTERERS'

CL 12. ADDITIONAL OIL POLLUTION INSURANCE CLAUSE.
    A) INSERT 'USD 1 BILLION'
    B) DELETE
    C) DELETE 'AND B'

CL 13. CARGO RETENTION CLAUSE.
DELETE 'DEDUCT' INSERT 'CLAIM' ADD AT THE END 'OWNERS HAVE THE RIGHT
TO
APPOINT THEIR OWN PANDI SURVEYOR AT THEIR TIME AND EXPENSE'

CL 14. DRUG AND ALCOHOL ABUSE CLAUSE.

CL 15. INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE.
DELETE AND INSERT BIMCO ISM CLAUSE

CL 16. COMPANY APPROVALS CLAUSE.
DELETE VESSEL HAS NO MAJOR APPROVALS

CL 17. ELIGIBILITY CLAUSE

CL 18. OPA-90
DELETE

CL 19. UNITED STATES COAST GUARD (USCG) CLAUSE.

DELETE

CL 20.    U.S. CUSTOMS REGULATION CLAUSE.
DELETE

CL 21.    ISPS

CL 22.    VACUUM GASOIL (VGO)/LOW SULPHUR WAXY RESIDUE (LSWR) CLAUSE.
DELETE

CL 23.    PART CARGO.
DELETE

CL 24.    COMMINGLE CLAUSE. (AS AMEND 19.JAN.2006)
AA) CHARTERER HAVE THE RIGHT TO COMMINGLE CARGO IN VESSELS TANKS AND MASTER
WILL EXECUTE THIS OPERATION IN ACCORDANCE WITH CHARTERERS INSTRUCTIONS,
SUBJECT TO THE SAFETY OF THE SHIP.

BB) IF CHARTERERS EXERCISE SUCH OPTION, OWNERS MAKE NO WARRANTY AS TO CARGO
QUALITY OR EVENNESS OF CARGO MIXTURE AND CHARTERERS WILL INDEMNIFY OWNERS
AGAINST ANY CLAIM  ARISING DIRECTLY FROM COMPLYING WITH CHARTERERS INSTRUCTIONS
UNDER THIS CLAUSE.

CC) CHARTERERS WILL PROVIDE OWNERS WITH A LETTER OF INDEMNITY IN ACCORDANCE
WITH BB) ABOVE, AND OWNERS ACCEPT THAT BILLS OF LADING WILL BE ISSUED CLEAN.

DD) FOR THE AVOIDANCE OF DOUBT, WHERE AT CERTAIN HANDLING TERMINALS (E.G
VENTSPILS) MULTIPLE BILLS OF LADING ARE ISSUED FOR A SINGLE GRADE OF CARGO,
THIS PRACTICE SHALL NOT BE CONSIDERED TO CONSTITUTE COMMINGLING.

CL 25.    HEATING UP CLAUSE.
DELETE

CL 26.    SAMPLING CLAUSE.
DELETE AND INSERT 'CHARTERERS HAVE THE LIBERTY TO ORDER THE VESSEL TO CALL AT A PORT EN ROUTE OR APPROXIMATELY EN ROUTE FROM LOAD PORT TO DISCH
PORT(S) FOR SAMPLING PURPOSES. CARTERERS THEN SHALL PAY ALONG WITH THE FREIGHT
ALL THE DEVIATION EXPENSES AND ALL PORT DISBURSEMENTS AGAINST SUPPORTING
DOCUMENTS'

CL 27.    BLENDING CLAUSE.
DELETE

CL 28.    LIGHTERAGE CLAUSE.
DELETE 'INCL BACK LOADING' ALSO ADD AT THE END 'IN CASE OF LIGHTENING/STS
OPERATION OPEN SEA TERMINAL TIME TO COUNT IN FULL IRRESPECTIVE OF BAD WEATHER
CONDITIONS. IN CASE AFTER LIGHTENING /STS VESSEL WILL GO ALONG SIDE TERMINAL NO
6 HRS NOTICE TIME IS REQUIRED AND TIME WILL COUNT IN FULL. LIGHTERING OR STS

SHALL BE PERFORMED IN ACCORDANCE TO THE LATEST EDITION OF THE
ICS/OCIMFS STS
TRANSFER GUIDE.CHARTERERS SHALL PAY THE COST OF PROVIDING ALL HOSES
ADEQUATE
FENDERS AND EQUIPMENT NECESSARY FOR THE LIGHTERAGE'

CL 29.    PUMPING CLAUSE.
LINE 2 AFTER 100 PSI INSERT 'BASIS TWO LINES' AFTER 'HRR' INSERT
'PROVEN'
LINE 3 AFTER PERMIT ADD 'ALWAYS EXCL WHEN STRIPPING, BUT MAXIMUM 3
HRS' ADD AT
THE END OF 1ST PARAGRAPH 'IF AVAILABLE OTHERWISE BY AGENTS ONLY'

CL 30.    DIVERSION CLAUSE.
ADD AT THE END 'EXPENSES WILL BE PAYABLE TOGETHER WITH FREIGHT AGAINST
SUPPORTING DOCUMENTS'

CL 31.    INTERIM PORTS CLAUSE.
LAST LINE DELETE '90' INSERT '120'

CL 32.    OPERATIONS CLAUSE.
          A)  CLEAN BALLAST.
          B)  CRUDE OIL WASHING. DELETE

CL 33.    AGENCY CLAUSE
DELETE AND INSERT CHARTS AGENT BOTH ENDS. PROVIDED COMPETITIVE, BUT
CHARTS TO ENSURE THEIR NOMINATED AGENTS ARE COMPETITIVE WITH OWNERS
QUOTE ,
PROVIDED RECEIVED FROM A BONA VIDA REPRESENATIVES IN THE NOMNINATED
PORT.

CL 34.    OPERATIONAL COMPLIANCE CLAUSE.

CL 35.    EARLY LOADING CLAUSE.
DELETE 'ALL TIME' AND INSERT 'HALF TIME'

CL 36.    CARGO DOCUMENTS CLAUSE.

CL 37.    EXCESS BERTH OCCUPANCY CLAUSE.

CL 38.    WAITING VOYAGE ORDERS CLAUSE.
ADD AT THE END 'INCLUDING PROVED ADDITIONAL EXPENSES AND BUNKERS
CONSUMED
WHICH ARE PAYABLE ALONG WITH FREIGHT AGAINST SUPPORTING DOCUMENTS'

CL 39.    SPEED CLAUSE
'ABT 11.5 KNOTS' DELETE 2ND, 3RD, 4TH PARAGRAPH

CL 40.    SOUTH EAST ASIA CLAUSES - DELETE
          A)  KOREAN LAYTIME.
          B)  CHINESE RIVER PORTS.
          C)  KOREAN ANCHOR DUES.

END RECAP

MANY THANKS FOR CONTINUED SUPPORT.

REGARDS
ADAM TOALE
EA GIBSON SHIPBROKERS LTD
+ 44 20 7667 1129

The information transmitted is intended only for the person or entity to which
it is addressed and may contain confidential and/or privileged material. Any
review, retransmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other than the
intended recipient is prohibited. If you received this in error, please contact

the sender and delete the material from any computer.

E. A. Gibson Shipbrokers is a limited company registered in England and Wales.
Reg No. 710161. Registered office: E. A. Gibson Shipbrokers Ltd, Audrey House,
16-20 Ely Place, London. EC1P 1HP

Sent with Danaos Info@Gate Communication Software



EXHIBIT 2

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977



ORIGINAL

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

### PREAMBLE

LONDON
Place

1st August 2007
Date

IT IS THIS DAY AGREED between *IMS S.A.*

~~chartered owner/owner~~ (hereinafter called the "Owner") of the *Singapore flag, built 1988*

~~SEMS~~ *M.T. "AXINOS"* (hereinafter called the "Vessel")

and *PROJECTOR S.A. OR NOMINEE* (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A. Description and Position of Vessel:

Deadweight: *39,998 metric tonnes* tons ~~(2240 lbs.)~~ Classed: *Norske Veritas*

Loaded draft of Vessel on assigned summer freeboard *12.1405 metres* ft ~~in.~~ in salt water.

Capacity for cargo: *45,125.6 cubic metres @ 98% excluding slops. Slop tank capacity @ 98% 2,182.78 cubic metres* tons ~~(of 2240 lbs. each)~~ ~~.% more or less, Vessel's option.~~

| | | | |
|---|---|---|---|
| Coated: | [ x ] Yes | [ ] No *Epoxy* | |
| Coiled: | [ ] Yes | [ x ] No | Last ~~two~~ *three* cargoes: *(1) Unleaded Mogas*<br>*(2) Unleaded Mogas*<br>*(3) Gasoil* |

Now: *Vessel sailed Lagos 20th July 2007* Expected Ready: *ETA basis Amsterdam 9th - 10th August 2007 all going well, weather and safe navigation permitting.*

B. Laydays:

Commencing: *13th August 2007*     Cancelling: *15th August 2007*

C. Loading Port(s):     *One or two safe port(s) ANTWERP/ROTTERDAM/AMSTERDAM*

Charterer's Option

D. Discharging Port(s):     *One, two or three safe port(s) WEST AFRICA (DAKAR-DOUALA RANGE), excluding Liberia and any other United Nation banned countries.*

Charterer's Option

E. Cargo: *MINIMUM 33,000 METRIC TONNES, Charterer's have the option to complete upto full cargo. One or two grades within vessel's natural segregation Clean Petroleum Products, Gasoline Blendstock, undyed, unleaded, undarker than 2.5 NPA,minimum SG 0.74 at loaded temperature excluding pure MTBE. Charterers have the option to load one grade Gasoil (minimum SG 0.84)*

Charterer's Option

9

F.   Freight Rate:  *At 185% of the rate provided for the voyage in the Worldwide Tanker Nominal Freight Scale (Worldscale), as per 2007 Schedule. per ton (of 2240 lbs. each).  Overage, if any, to be at 50% up to 33,500 metric tonnes. Above 33,500 metric tonnes overage to be at 100%.*

G.   Freight Payable in to:  *United States Dollars by telegraphic transfer to: Crumble Trading Corp., 80 Broad Street, Monrovia, Liberia, bank details: HSBC Bank Plc, 93 Akti Miaouli GR 18538, SWIFT Address: MIDLGRAA, Piraeus, Greece, Account No.: 001 076 348036, f/o: Crumble Trading Corp. under ref: Axinos - Projector, telex no: 211788 MIDP GR* at

H.   Total Laytime in Running Hours:  *See Projector Terms No. 1 (c) attached*

I.   Demurrage per day: *US$20,000.00 or pro rata*

J.   Commission of *1.25* % is payable by Owner to *E.A. Gibson Shipbrokers Limited, London, 1.25% payable to Navig8 Europe Ltd and 1.25% payable to IMS.(Also see Projector Terms No. 5 attached)*

   on the actual amount *of* freight, *deadfreight and demurrage* when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.   Tovalop. Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.   Special Provisions: *Nos. 1 to 11 inclusive, as attached, shall be deemed to be incorporated in this Charter Party.*

   IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate

as of the day and year first above written.

Witness the signature of:

By:

Witness the Signature of:

By:

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

*10*

## PART II

1. WARRANTY - VOYAGE - CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all-convenient *utmost* dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereto as she may safely get (always afloat), and being seaworthy, and having at: pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owners and/or Master's control excepted, shall load (always afloat), from the fasters of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If loading of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as allowed on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:
On a voyage to a port or ports in:

| | |
|---|---|
| ST KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the B/Ls of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the canceling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect. *Should Owner's become aware that vessel will miss her cancelling date then Owners to advise Charterers of new required laycan and Charterers to declare within 2 working days to maintain or cancel the Charter Party.*

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, *irrespective of whether the berth is reachable on arrival or not*, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime, *or demurrage. In any event Charterer shall be entitled to six hours notice of readiness at loading and discharge ports, even if the vessel is on demurrage.*

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime *or time on demurrage*. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime *or time on demurrage*. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water, or slops, will not count as used laytime *or time on demurrage*.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, *delays occur and/or* demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, *such delays shall count at half laytime, or if on demurrage* the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable *for any demurrage* for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots. *The Charterer shall not be liable for any delays caused by awaiting tide and/or awaiting daylight and/or awaiting pilot(s) and/or awaiting tug(s). Time lost to be split 50/50 between Charterers and Owners.*

9. SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to such berth, charges for running lines on arrival and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterers and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be assessed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are intended on the basis of quantity of cargo), including but not limited to French dues de quai and Spanish derrama taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but

this clause shall not restrict the Charterer from loading or stopping off Crude Oil from vessels or barges inside or outside the area to any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignees, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If an account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17. (a). QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination, or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies; pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act, of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 **1974 as amended 1990 and 1994** and, as to matters not provided for by these rules, according to the laws and usages of the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not to the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat; shall be paid by the Charterers or Cargo Owners. In the latter event the Charterers shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risk insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be

deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.   LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.   AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.   BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.   ARBITRATION. ~~Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the receipt of such notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator was appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises~~   *See Projector Terms No.8 attached.*

25.   SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26.   OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that disembers shall be used for the separation of oil/water, such demulsifiers shall be absorbed by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with the cargo as it is possible for Charterer to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by                                                                      Steamship/Motorship

on board the                                                                                                                           is Master, at the port of

whereof

in to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                                                  and                                                                  , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed                                                                                         Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                                                         this                                    day of

                                                                                                                                                                            Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by editing out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

13

## SPECIAL PROVISIONS FOR M.T. "AXINOS" CHARTER PARTY DATED 1ST AUGUST 2007

1. **PORT COSTS**

    Maximum US$15,000 disbursement account at discharge port.  Charterer's option to pay port costs direct and US$15,000 to be deducted from freight.

2. Owners warrant vessel can single buoy mooring on port and starboard sides.

3. If ship-to-ship transfer, no disbursements for Owner's account.

4. Charterers shall nominate vessel's agents at both port(s) of load and discharge, provided competitive.

5. Maximum 3 hours awaiting cargo documents after completion of discharge for Owner's account.

6. Taxes dues on freight and/or cargo to be for Charterer's account and settled directly by them.

7. **OWENERS ADDITIONAL CLAUSE: IN-TRANSIT LOSS CLAUSE:**

    Owners will be responsible for the full amount of any intransit loss exceeds 0.5 % and Charterers shall have the right to claim an amount equal to the FOB port-of-loading value of such cargo, plus freight due with respect thereto.  If transit loss is defined as the difference between vessels volume after loading at the lading port and before unloading at the discharging port.  Pumpable cargo shall not constitute an actual loss.  In transit loss is applicable provided ullages are taken alongside by shore based berth at load/discharge port.

8. **WEST AFRICA CLAUSE**

    - Re: Nigerian Certificate of Compliance:
      Charterers to arrange for same at their time and expense.  Should any delays be incurred same to be for Charterer's account.

    - Any time awaiting naval clearance to be for Charterer's account.

    - Any delays in obtaining Nigerian task force permission to enter Nigerian waters to count in full as used laytime or demurrage, if on demurrage.

    - National Maritime Authority fee, if imposed, not to be for Owner's account.  Charterers are to be responsible for the National Maritime Authority approvals.

# SPECIAL PROVISIONS FOR M.T. "AXINOS"
# CHARTER PARTY DATED 1ST AUGUST 2007
# CONTINUED

## 8.    WEST AFRICA CLAUSE

-    Any delay in Nigerian/West Africa in berthing, discharging or sailing due to strikes, bad weather, lockouts, restraints, work-to-rule, go slow and of other cause over which Owners/Master/Crew have not control to count as laytime or demurrage, if on demurrage and expenses so incurred, if any, to be for Charterer's account.

-    Undisputed demurrage incurred at West Africa discharge port/port(s) to be paid every 10 days in areas, final portion when settling the accounts.

## 9.    BIMCO ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

## 10.    COMMINGLE CLAUSE. (AS AMEND 19.JAN.2006)

AA)    Charterers have the right to commingle cargo in vessels tanks and Master will execute this operation in accordance with Charterers instructions, subject to the safety of the ship.

BB)    If Charterers exercise such option, owners make no warranty as to cargo quality or evenness of cargo mixture and Charterers will indemnify Owners against any claim arising directly from complying with Charterers instructions under this clause.

CC)    Charterers will provide owners with a Letter of Indemnity in accordance with bb) above, and owners accept that Bills of Lading will be issued Clean.

DD)    For the avoidance of doubt, where at certain handling terminals (e.g Ventspils) multiple Bills of Lading are issued for a single grade of cargo, this practice shall not be considered to constitute commingling.

## SPECIAL PROVISIONS FOR M.T. "AXINOS"
## CHARTER PARTY DATED 1ST AUGUST 2007
## CONTINUED

11.   Projector Terms ( dated 15th April 1999 amended 24th May 2004)s nos. 1 to 40
      inclusive, as attached 10, 16, 18, 19, 20, 22, 23, 25, 27 and 40 shall be deemed to
      be incorporated in this Charter Party.

16

ADDITIONAL CLAUSES
CHARTER PARTY DATED

ASBATANKVOY CHARTER PARTY

PROJECTOR VOYAGE CHARTERING TERMS,
DATED 15 APRIL 1999
AMENDED 24 MAY 2004

1.   General Terms.
2.   Amendments to the Asbatankvoy
     a)  Amendment to Part I, Item K
     b)  Amendment to Part I, Item L
     c)  Amendment to Part II, Clause 1
     d)  Amendment to Part II, Clause 5
     e)  Amendment to Part II, Clause 6.
     f)  Amendment to Part II, Clause 7.
     g)  Amendment to Part II, Clause 8.
     h)  Amendment to Part II, Clause 9.
     i)  Amendment to Part II, Clause 12
     j)  Amendment to Part I, Clause
         20(b)(iii)
     k)  Amendment to Part II, Clause 24
3.   Bill(s) of Lading/Indemnity Clause.
4.   Position Clause
5.   Address Commission.
6.   Weather Clause.
7.   Third Party Arrest Clause.
8.   Law and Litigation Clause.
9.   Claims Clause.
10.  Overage Insurance.
11.  War Risk Clause
12.  Additional Oil Pollution Insurance
     Clause.
13.  Cargo Retention Clause.
14.  Drug and Alcohol Abuse Clause.
15.  International Safety Management (ISM)
     Code.
16.  Company Approvals Clause.
17.  Eligibility Clause

18.  OPA 90
19.  United States Const Guard (USCG)
     Clause.
20.  U.S. Customs Regulation Clause.
21.  ISPS
22.  Vacuum Gasoil (VGO)/Low Sulphur
     Waxy Residue (LSWR) Clause.
23.  Part Cargo.
24.  Commingle Clause
25.  Heating up Clause.
26.  Sampling Clause.
27.  Blending Clause.
28.  Lighterage Clause.
29.  Pumping Clause.
30.  Diversion Clause.
31.  Interim Ports Clause.
32.  Operations Clause.
     a)  Clean Ballast.
     b)  Crude Oil Washing .
33.  Agency Clause
34.  Operational Compliance Clause.
35.  Early Loading Clause.
36.  Cargo Documents Clause.
37.  Excess Berth Occupancy Clause.
38.  Waiting Voyage Orders Clause.
39.  Speed Clause
40.  South East Asia Clauses
     a)  Korean Laytime.
     b)  Chinese River Ports.
     c)  Korean Anchor Dues.

17

## ADDITIONAL CLAUSES
### CHARTER PARTY DATED

## PROJECTOR VOYAGE CHARTERING TERMS,
### DATED 15TH APRIL 1999
### AMENDED 24TH MAY 2004.

The following "Projector Voyage Chartering Terms, 15th April 1999" will remain in force throughout the duration of the charter, together with any additional clause(s) or amendment(s) agreed between Charterer and Owner. Owner guarantees compliance with all warranties/obligations throughout the duration of this charter.

1.     **GENERAL TERMS.**
a)     Asbatankvoy Charterparty.
b)     "Worldscale" terms and conditions as at date of Charterparty.
c)     Eighty four (84) hours laytime allowance *Sundays and holidays included*
d)     York/Antwerp Rules 1974, as amended 1990 and 1994
e)     Freight payable in United States Dollars to the Owner's nominated account by telegraphic transfer.
f)     The negotiation and fixture to remain private and confidential at all times.
g)     Owner warrants that throughout the duration of this charter, the vessel will be owned or demise chartered by a member of the 'International Tanker Owner's Pollution Federation Limited' (ITOPF).
h)     Owner warrants that throughout the duration of this charter, the vessel will be entered in the following Protection and Indemnity Club (P & I) -- *WEST OF ENGLAND*

2.     **AMENDMENTS TO THE ASBATANKVOY.**
a)     Amendment to Part I, Item K
       Delete "New York (Strike out one)".

b)     Amendment to Part I, Item L
       Delete.

c)     Amendment to Part II, Clause 1
       First line, delete "all convenient", insert "utmost".

d)     Amendment to Part II, Clause 5
       ~~Delete "such cancellation date" insert "vessels arrival at loadport"~~
       ~~Add at end: "Cancellation or failure to cancel shall be without prejudice to any claim for damages Charterer may have against the Owner".~~

       *Add at end: Should Owners become aware that vessel will miss her cancelling date then Owners to advise Charterers of new required laycan and Charterers to declare within 2 working days to maintain or cancel the Charter Party.*

e)     Amendment to Part II, Clause 6
       Last sentence, after "However," insert: "irrespective of whether the berth is reachable on arrival or not,"

       Last line, add at end: "or demurrage".

Add at end: "In any event Charterer shall be entitled to six hours notice of readiness at loading and discharge ports, even if the vessel is on demurrage".

f)    Amendment to Part II, Clause 7
      Add, in each instance, after "used laytime": "or time on demurrage".

g)    Amendment to Part II, Clause 8
      Second sentence, after "If, however," insert: "delays occur and/or", and after, "…or consignee of the cargo," insert: "such delays shall count as half laytime, or if on demurrage".

      Last sentence, delete "..for any demurrage.."

      Add at end: "The Charterer shall not be liable for any delays caused by 'awaiting tide' and/or waiting daylight and/or awaiting pilot(s) and/or awaiting tug(s). *Time lost to be split 50/50 between Charterers and Owners.*"

h)    ~~Amendment to Part II, Clause 9~~
      ~~Delete, "..reachable on her arrival.".~~

i)    ~~Amendment to Part II, Clause 12~~
      ~~Delete Clause 12 in full and insert:~~

      ~~"Except where freight and/or specified port calls are agreed on a lump sum basis, dues and other charges upon the vessel, including those assessed by reference to the quantity of cargo loaded or discharged and any taxes on freight whatsoever shall be paid by the Owner, and dues and other charges upon the cargo shall be paid by Charterer. However, notwithstanding the foregoing, where under a provision of "Worldscale" and where freight and/or specified port calls are not agreed on a lump sum basis, a due or charge is expressly stated to be for the account of Owner or Charterer then such due or charge shall be payable in accordance with the provision of "Worldscale".~~

      ~~Where freight and/or specified port calls are agreed to be on a lump sum basis, such lump sum rate is inclusive of all dues and charges whether levied upon the vessel, freight, or cargo."~~

j)    Amendment to Part II, Clause 20 (b) (iii)
      Delete '1950', insert "1974 as amended 1990, and 1994".

k)    Amendment to Part II, Clause 24
      Delete Clause 24, refer Rider Clause 8.

19

3.    **BILL(S) OF LADING/INDEMNITY CLAUSE.**
Discharging port(s) or range(s), shown in Bill(s) of Lading not to constitute a declaration of discharging port(s) or range(s) and Charterer to have the right to order the vessel to any port within the terms of this charter.

Where and when specifically instructed to do so by Charterer, Owner agrees to release the cargo onboard in the following cases:

a)    If no original Bill of Lading is available at discharge port(s) or;

b)    If vessel is ordered to discharge in a port different from the destination as shown in the Bill of Lading.

In consideration of Owner complying with Charterer's specific instructions, as above, Charterer shall, upon giving formal notification to Owner, *against Letter of Indemnity as per Owner's P and I Club wording, without bank guarantee* ~~invoke the following indemnity:~~

1.    ~~To indemnify Owner(s), Owner(s) servant(s) and agent(s) and to hold Owner(s) and them harmless in respect of any liability loss or damage of whatsoever nature which they may sustain by reason of Owner(s) causing the vessel to proceed to port(s) other than that named in the Bills of Lading and causing the vessel to deliver the cargo at such port(s) without the production of the Bills of Lading. Further, if Charterer requests Owner(s) to deliver the cargo to a person or persons other than the holders of the Bills of Lading to indemnify Owner(s) and hold Owner(s) harmless in respect of any loss or damage of whatsoever nature which Owner(s) may sustain by reason of Owner(s) doing so.~~

2.    ~~To pay Owner(s) on demand the amount of any loss or damage of whatsoever nature which the Master and/or agent(s) of the vessel and/or any other of Owner(s) servant(s) or agent(s) whatsoever, may incur as a result of the vessel proceeding and delivering the cargo as set out in paragraph 1, hereof.~~

3.    ~~In the event of any proceedings being commenced against Owner(s) or any of Owner(s), servant(s) or agent(s) in connection with the vessel having proceeded as aforesaid or having delivered the cargo in accordance with Charterer's request, to provide Owner(s) or their servant(s) or agent(s) from time to time on demand with sufficient funds to defend the said proceedings.~~

4.    ~~If the vessel or any other vessel or property belonging to the Owner(s) should be arrested or detained or if the arrest or detention thereof be threatened, to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and to indemnify Owner(s) in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.~~

5.    ~~If called upon to do so at any time while the goods are in Charterer's possession, custody or control, to redeliver the same to Owner(s).~~

20

6.   ~~To produce and deliver up to Owner(s), duly discharged all of the Bills of Lading for the cargoes signed by the Master or on his behalf, as soon as they have arrived and/or come into Charterer's possession.~~

7.   ~~The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon Owner(s) proceeding first against any person, whether or not such person is party to or liable under this indemnity.~~

8.   ~~This indemnity shall be construed in accordance with English Law and each and every person liable under this indemnity shall at Owner's request, submit to the jurisdiction of the High Court of Justice of England.~~

The above indemnity shall automatically be null and void upon presentation of the relevant Bill of Lading, or 13 (Thirteen) months after completion of discharge of cargo to which such indemnity is relevant.

4.   **POSITION CLAUSE**
Owners warrant that the vessel ~~is open at~~ *sailed Lagos 20th July 2007* with an E.T.A at charterers intended load port of *Amsterdam 9th – 10th August 2007, all going well* weather and safe navigation permitting. Owners to advise charterers, immediately, of any change in E.T.A of more than 12 hours.

5.   **ADDRESS COMMISSION.**
Two point five per cent (2.5%) address commission on freight, deadfreight and demurrage, which Charterer's are at liberty to deduct from freight, deadfreight and demurrage payments.

6.   **WEATHER CLAUSE.**
Any time lost at load and/or discharge port(s), whenever/howsoever lost, which is directly/indirectly attributed to weather conditions and/or 'sea state', shall count as half laytime or if the vessel is on demurrage, at one half demurrage rate. *Unless sea buoys, single point mooring, single buoy mooring, ship-to-ship transfer, open sea terminals, sea lines or if swell is making operation unsafe then time to count in full.*

7.   **THIRD PARTY ARREST CLAUSE.**
In the event of arrest or other sanction levied against the vessel or Charterer arising out of Owner's breach or any fault of Owner, Owner shall indemnify Charterer for any damages, penalties, costs ~~and consequences~~ and any time vessel is under arrest *due to Owners breach or any fault of Owners* is fully for Owner's account.

8.   **LAW AND LITIGATION CLAUSE.**
This charter shall be construed and the relations between the parties determined, in accordance with the laws of England.

Any dispute arising out of or in connection with this charter, involving amounts in excess of US$ 50,000 (United States Dollars Fifty Thousand) shall be subject to the jurisdiction of the English High Court.

Any dispute arising out of or in connection with this charter involving amounts up to and including US$ 50,000, (United States Dollars Fifty Thousand) shall be referred to arbitration by a single arbitrator in London in accordance with the provisions of the London Maritime Arbitrators Association (LMAA) Small Claims Procedure.

21

9. **CLAIMS CLAUSE.**
Charterer shall be discharged and released from all liability in respect of any claims Owner(s) may have under this Charterparty (~~such as but not limited to,~~ claims for deadfreight, demurrage, port expenses, shifting expenses), unless claim has been presented in writing to Charterer with all available supporting documents within 90 (ninety) days from completion of discharge of cargo carried under this Charterparty.

10. ~~OVER-AGE INSURANCE.~~
~~Over-age insurance on cargo owing to vessel's age shall be for Owner's account. (If over 15 years).~~

11. **WAR RISK CLAUSE.**
Increase of hull and machinery 'War Risk Premiums' and 'Crew War Bonus' over and above those in effect on the date of the Charterparty, will be for Charterer's account. Any premiums or increases thereto attributable to closure i.e. blocking and trapping insurance, shall be for the ~~Owner's~~ *Charterer's* account. *Extra war risk insurance to be paid to Owners against Owners invoice, any rebate obtained to be passed to Charterers.* ~~Surcharges which are in effect on the date of this Charterparty are for Owner's account for the first 14 (fourteen) days, thereafter Charterer's account.~~

For the purposes of this clause, a war risk area will constitute that which has been declared a war risk area by 'The War Risks Rating Committee in London', as recognised by Lloyd's of London. In addition, any increase in insurance premiums to be limited to that declared by 'The War Risks Rating Committee in London', as recognised by Lloyd's of London.

Charterer(s) to have the benefit of any rebates Owner(s) receive.

12. **ADDITIONAL OIL POLLUTION INSURANCE CLAUSE.**
Owner warrants that they have and will maintain throughout the period of this charter:

(a) The standard oil pollution insurance cover (currently US$ 1 Billion) available from their P & I Clubs; and

(b) ~~Any additional oil pollution insurance cover which becomes available via their P & I Club or through underwriters providing first class security.~~

(c) i) Owner(s) to provide written evidence of (a) ~~and (b)~~ from their P and I Club and/or underwriters providing first class security.

ii) Such documented evidence to be received by Charterer within one normal working day of the day the fixture was confirmed.

iii) If such documented evidence has not been received by Charterer before the indicated period then Charterer shall have the option to either cancel the charter or extend the period under ii) by a further working day.

22

13. **CARGO RETENTION CLAUSE.**

In the event that any cargo remains on board upon completion of discharge, Charterer shall have the right to ~~deduct~~ *claim* from freight an amount equal to the FOB load port value of such cargo plus an apportionment of freight, with respect thereto, provided that the volume of cargo remaining onboard is liquid and pumpable by the vessel's pumps, or would have been liquid and pumpable but for the fault or negligence of Owner(s), the Master, the vessel or her Crew (including, but not limited to incorrect trim and incorrect heating procedures), as determined by surveyor appointed by Charterer and acceptable to both Owner and Charterer, whose findings shall be final and binding.

Any action or lack of action in accordance with this provision, shall be without prejudice to any other rights or obligations of the parties. For the purposes of this clause, any surveyor who is ISO 9002 certified, shall be considered acceptable to both Owner and Charterer. *Owners have the right to appoint their own P and I surveyor at their time and expense.*

14. **DRUG AND ALCOHOL ABUSE CLAUSE.**

Owner warrants that it has a policy on drug and alcohol abuse applicable to the vessel which meets or exceeds the standards in the 'Oil Companies International Marine Forum guidelines for the control of drug and alcohol onboard ship, O.C.I.M.F. January 1995'. Owner further warrants that this policy will remain in effect during the term of this charter and that Owner shall exercise due diligence to ensure that this policy is complied with.

15. **INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE.** *(See Special Provisions No. 9 attached)*

~~Owner warrants that a 'Safety Management System (SMS)' in accordance with the 'ISM Code' will be in-operation throughout the duration of this charter. It is a condition of this Charterparty that on and after 1ˢᵗ July 1998 the Owners or "the Company" (as defined by the ISM Code) shall have a valid 'Document Of Compliance (DOC)' and the vessel shall have a valid 'Safety Management Certificate (SMC)'. Upon request the Owner(s) shall provide a true copy of the relevant DOC and SMC to the Charterer.~~

~~Without limitation to Charterer's remedies under this clause, Owner shall indemnify the Charterer for any losses, damages or expenses directly/indirectly attributed to vessel's non-compliance with the ISM code and/or to Owner's failure to respond (or delay in responding) to Charterer's request for the foregoing certificates and any delays, to the extent arising from such non-compliance or failure/delay in~~ responding, shall not count as laytime or, if vessel is on demurrage, as time on demurrage.

16. ~~**OIL COMPANY APPROVALS CLAUSE.**~~

~~Owner warrants that the vessel is approved by the following companies and will remain so throughout the duration of this Charterparty (Owner'(s) to advise, including inspection dates and expiry dates)~~

17. **ELIGIBILITY CLAUSE.**

Owner warrants that the vessel is in all respects eligible and not prevented for any reason whatsoever for trading to the ports and places specified in Clauses C and D hereof and that at all necessary time, she shall have onboard all certificates, records and other documents required for such services. If any element of this warranty is breached, any delay resulting therefrom shall not count as laytime, or if the vessel is on demurrage, as time on demurrage and Owner shall indemnify Charter for any damages or expenses incurred as a result of such breach.

23

18.   UNITED STATES OIL POLLUTION ACT OF 1990 (OPA-90).
      Owner warrants:

      a)    That they and/or the vessel operator has submitted to the United States Coast Guard for
            approval a response plan for the vessel (VRP) which meets in full the requirements of
            the United States Oil Pollution Act of 1990, the Government Regulations issued
            thereunder and any change, rule or regulation in substitution of, or supplementary to,
            such Circular (collectively 'VRP Requirements').

      b)    That the VRP is approved and the vessel is operated in compliance therewith, when and
            as required by the VRP requirements.

      c)    That the Owner or operator of the vessel and the vessel fully meets all other
            requirements of OPA and any Government's Regulations or guidelines issued
            thereunder.

      This clause does not in any way lessen the overall effect or relieve the Owner of any State
      obligations in respect of Vessel Response Plans or other pollution requirements.

19.   UNITED STATES COAST GUARD (USCG) CLAUSE.
      Owner warrants during the term of this charter the vessel will fully comply, if not in
      compliance will hold necessary waivers, with all applicable United States Coast Guard
      Regulations now in effect. Including, but not limited to, pollution and safety regulations of the
      Code of Federal Regulations, as amended, and all other applicable state pollution and safety
      laws, rules and regulations as may be promulgated and subsequent amendment thereto.

      The vessel is to have valid certificate(s) onboard complying to the above regulations at all
      times during the currency of this Charterparty.

      Owner to indemnify Charterer for any penalties, costs or consequences resulting from vessel's
      non-compliance and any delays shall not count as used laytime or time on demurrage if vessel
      is on demurrage.

20.   U.S. CUSTOMS REGULATION CLAUSE.
      Owner warrants that, in accordance with U.S. Customs Regulation 19 CFR, section 4.7A and
      178.2 as amended, they have the standard carrier Alpha code (SCAC) which will prefix a Bill
      of Lading serial number and a Form A. The 'Unique Identifier' is to be entered on all Bills of
      Lading, cargo manifest, cargo declarations and other cargo documents issued under this
      Charterparty relating to the carriage of goods to the United States. Charterer is not
      responsible for any losses or delays resulting from Owner's failure to comply with the
      foregoing.
      Owners warrant that they are aware of the requirements of the U.S Bureau of Customs and
      Border Protection ruling issued on December 5th 2003 under Federal Register Part II
      Department of Homeland Security 19 CFR Parts 4, 103, et al. and will comply fully with
      these requirements for entering U.S ports.

24

21. **ISPS.**

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or the Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

(b) (i) The Charterers shall provide the CSO and or the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and or the SSO/Master.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers account.

22. ~~VACUUM GASOIL (VGO)/ LOW SULPHUR WAXY RESIDUE (LSWR) CLAUSE.~~
~~If loading VGO or LSWR and the previous cargo was fuel oil, marine diesel oil, VGO or gasoil, it is essential that no tank cleaning is performed prior to loading except to ensure that all tanks, lines and pumps are stripped dry and drained of any previous cargo. Furthermore the R.O.B./O.B.Q. should not exceed 0.1 per cent of cargo quantity and that these should not contain water.~~

~~After all other cargoes, the following tank cleaning must be performed.~~

~~1.    Hot machine wash all tanks designated to carry VGO/LSWR (water pressure 150 psi, temperature 150 deg Fahrenheit).~~

~~2.    Strip tanks completely dry and drain all lines and pumps of water.~~

~~3.    a)    Thoroughly wash all tanks, lines and pumps designated for VGO/LSWR with fresh water to eliminate all traces of salt water.~~

~~b)    Drain pumps and lines.~~

~~c)    Dry out tanks.~~

~~4.    Irrespective of previous cargo, where salt water ballast has been loaded into cargo tanks designated for VGO/LSWR, the vessel shall:~~

~~a)    On completion of de-ballasting strip tanks dry.~~

25

~~b)    Drain pumps and lines.~~

~~c)    Fresh water rinse all salt water contaminated tanks, lines and pumps.~~

~~d)    Drain pumps and lines.~~

~~e)    Dry out tanks.~~

~~f)    Where possible, load first into tanks which previously contained ballast to at least 25 pct full before switching to other tanks.~~

~~5.    Regardless of previous cargo, prior to loading, all heating coils must be blown through with steam to ensure there is no entrapment of salt water through heating coil leakage.~~

~~6.    Heating: Throughout the voyage and discharge, the vessel should maintain loaded temperature or a temperature of plus 15 deg C higher than cargo pour point whichever is higher.~~

23.    ~~PART CARGO.~~
~~The "Worldscale" freight rate for tonnage loaded in excess of minimum agreed quantity will be at 50% (fifty percent) of the agreed "Worldscale" freight rate(s) except where lump sum rates have been agreed.~~

24.    COMMINGLE CLAUSE. *(See Special Provisions No. 10 attached)*
~~Charterer to have the right to commingle the cargo in vessel's tanks and Master to execute this operation as per Charterer's instructions subject to ship's safety.~~

25.    ~~HEATING UP CLAUSE.~~
~~If required by Charterer's, vessel shall raise cargo temperature but always to a maximum of 135 degrees Fahrenheit. Additional costs associated with increasing cargo temperatures to be reimbursed to Owner by Charterer at cost, payable against Owner's invoice and supporting documentation.~~

26.    SAMPLING CLAUSE.
~~Charterer to have the liberty to order the vessel to call at a port for sampling purposes. All port costs to be for the Charterer's account and all time lost to count as used laytime or time on demurrage, if vessel is on demurrage.~~

*Charterers have the liberty to order the vessel to call at a port en-route or approximately en route from load port to discharge port(s) for sampling purposes. Charterers then shall pay along with the freight, all the deviation expenses and all port disbursements against supporting documents.*

27.    ~~BLENDING CLAUSE.~~
~~Charterer to have the option of discharging part or all cargo in one safe port and reloading same port for further discharge within the agreed ranges. Time at the discharge/reload port to count as laytime or if vessel is on demurrage, as time on demurrage in accordance with Charterparty terms and conditions. Freight always to be based on the maximum Bill of Lading quantity carried on any part of the voyage, or the minimum quantity as per~~

26

~~Charterparty, which ever is the greater. Reload port to be considered as second loadport for freight calculation purposes.~~

28. **LIGHTERAGE CLAUSE.**

If lightering/ship to ship (STS) is required at any designated port, safe place or anchorage, time consumed performing this operation (~~including back-loading~~) shall count as laytime or time on demurrage in accordance with Charterparty terms and conditions. In either event, time shall commence six (6) hours after anchoring or whenever the lighterage/STS craft is all secure alongside, whichever occurs first. The anchorage, STS or lighterage area shall not be considered as an additional port or berth and any running time from such lighterage area shall not count as laytime or time on demurrage. *In case of lightening/ship-to-ship transfer operation open sea terminal, time to count in full irrespective of bad weather conditions. In case after lightening/ship-to-ship transfer vessel will go along side terminal no 6 hours notice time is required and time will count in full. Lightering or ship-to-ship transfer shall be performed in accordance to the latest edition of the ICS/OCIMF ship-to-ship transfer guide. Charterers shall pay the cost of providing all hoses adequate fenders and equipment necessary for the lighterage.*

29. **PUMPING CLAUSE.**

Owner(s) to agree to discharge the entire cargo within 24 hours or maintain 100 P.S.I. (pounds per square inch) *basis two lines* at the ships rail provided the shore facilities permit. If shore facilities do not permit *always excluding when stripping, but maximum 3 hours* discharge within agreed time, then Master to keep pumping logs and issue a letter of protest and to make best endeavours to have both countersigned by the terminal *if available, otherwise by agents only.*

Should it become necessary to withdraw the ship from berth because of her *proven* failure to maintain the discharge rate, all time and expenses incurred are to be for Owner's account.

30. **DIVERSION CLAUSE.**

Notwithstanding anything else to the contrary in this Charterparty, and notwithstanding what loading and/or discharging port(s)/range(s) may have been nominated and Bill(s) of Lading issued. The Charterer shall have the right to change its nomination of the loading and/or discharging ports in accordance with Part I, C and D of the charter. Any extra time and expenses incurred by Owner in complying with Charterer's orders shall be for Charterer's account and calculated in accordance with Part II, Clause 4, of this Charterparty. Charterer shall have the right to make as many changes as it deems necessary. *Expenses will be payable together with freight against supporting documents.*

31. **INTERIM PORTS CLAUSE.** (where applicable)

Charterer shall pay for any interim Load/Discharge port(s) at cost. Time for additional steaming, which exceeds direct route from first Loadport to furthest Discharge Port, shall be paid at the demurrage rate plus bunkers consumed, plus actual port costs, if any. The reasonable, estimated costs will be payable as an on account payment together with freight, followed by final invoice plus all supporting documents as soon as possible but not later than ~~90~~ *120* days after completion of this voyage.

27

## 32.   OPERATIONS CLAUSE.

   A)   CLEAN BALLAST.

   The vessel is to arrive at the loadport with clean ballast. However, in the event vessel discharges any ballast, notwithstanding the terms and conditions of part II of the Charterparty or "Worldscale", such related time and costs to be for Owner's account.

   B)   ~~CRUDE OIL WASHING.~~

   ~~Vessel will routinely employ Crude Oil Washing (COW) or discharge in accordance with the procedures described in the ICS/OCIMF "Guidelines for Tank Washing with Crude Oil", in the absence of express contrary instructions of the Charteror or prohibition by port or terminal regulations.~~

   ~~Owner(s) agree to comply with applicable port and terminal regulations and, as necessary, to submit any advance information or technical data that may be required by local authorities relative to the conduct of COW operations.~~

## 33.   AGENTS CLAUSE.

   ~~Owner to appoint their (Owner's) ship agent's in accordance with Charterer's suggestion at load and discharge port(s).~~

   *Charterers shall nominate vessel's agents at both ports of load and discharge, provided competitive but Charterers to ensure their nominated agents are competitive with Owner's quote, provided received from a bona fide representative in the nominated port.*

## 34.   OPERATIONAL COMPLIANCE CLAUSE.

   Voyage orders to constitute part of this charter.

   Owner shall indemnify Charterer for any damages, delays, costs and consequences of not complying with Charterer's voyage instructions given in accordance with the Charterparty.

   The vessel is to give ETA notices in accordance with Charterer's voyage instructions and where time permits at least 72/48/24 hours prior to arrival at load and discharge ports. When such ETA notices are not given, any resulting delay at either load or discharge port(s), to be for Owner's account.

   The vessel shall not tender Notice of Readiness prior to the earliest layday date specified in this Charterparty and laytime shall not commence before 06:00 hours local time on the earliest layday unless Charter consents in writing.

   If a conflict arises between terminal orders and Charterer's voyage instructions, the Master shall stop cargo operations and contact Charterer immediately. The terminal orders shall never supersede Charterer's voyage instructions and any conflict shall be resolved prior to resumption of cargo operations.

## 35.   EARLY LOADING CLAUSE.

   If Charterer permits vessel to tender NOR and berth prior to commencement of laydays, ~~all~~ *half* - time from berthing until commencement of laydays to be credited to Charterer(s) against time used at discharge port(s).

36. CARGO DOCUMENTS CLAUSE.
Maximum 3 hours for Owner's account for delays solely due to awaiting delivery of cargo documents, after hoses have been disconnected.

37. EXCESS BERTH OCCUPANCY CLAUSE.
If after the disconnection of hoses, the vessel remains at the berth exclusively for the vessels' purposes, the Owner will be responsible for all direct, or indirect, costs charged to Charterer(s) by the terminal, the supplier(s) or the receiver(s). Alternatively vessel shall vacate the berth immediately upon the terminals request.

38. WAITING VOYAGE ORDERS CLAUSE.
Charterer to have the liberty of instructing the vessel to wait for orders at a safe place. Time to count as used laytime or time on demurrage, if vessel is on demurrage *including proved additional expenses and bunkers consumed which are payable along with freight against supporting documents*.

39. SPEED CLAUSE.
The vessel shall perform the laden passage at *about 11.5* knots weather and safe navigation permitting.

~~Charterer shall have the option to request the vessel to increase her speed with Charterer reimbursing Owner for the additional bunkers consumed at replacement cost.~~

~~Charterer shall also have the option to request the vessel to reduce her speed on laden passage. Additional voyage time shall count against laytime or time on demurrage, if vessel is on demurrage and the value of any bunkers saved shall be deducted from any demurrage claim Owner(s) may have under this Charterparty with the value being calculated at replacement price.~~

~~Owner shall provide documentation to fully support the claims and calculations under this clause.~~

40. ~~SOUTH EAST ASIA CLAUSES.~~

~~a)   Chinese River Ports.~~
~~If the vessel is required to discharge at non-coastal Chinese ports/berths, all extra inbound transit time in the river in excess of normal steaming time, is to count as laytime or time on demurrage, if vessel is on demurrage. For purposes of calculating extra transit time, time is to count upon expiry of 6 hours after arrival at first inbound pilot station, until arrival at customary anchorage for such port/berth.~~

~~All extra transit time upto dropping outbound river pilot, in excess of the normal outbound steaming time in the river, to count as laytime or time on demurrage, if vessel is on demurrage.~~

~~b)   Korean Laytime.~~
~~In case the vessel arrives at quarantine station and tenders NOR to load between 3 hours before sunset and 0100 hours the next day, laytime shall count from 0700 hours the next day.~~

29

c) ~~Korean Anchor Dues.~~
   ~~South Korean Anchorage dues in excess of seventy two (72) hours to be for Charterer's account.~~

With reference to Part I, Clause A, the vessel is further described as follows:

| | |
|---|---|
| Length Overall | : 185.9 metres |
| Beam | : 27.43 |
| Built | : 1988 |
| Cubic Capacity at 98% | : 45,125.6 excluding slops |
| Slop capacity at 98% | : 2,182.78 cubic metres |
| SBT/CBT | : SBT |
| IGS | : Yes |
| TPC | : 44.84 metric tonnes |
| BCM | : 92.2 metres |
| KTM | : 46.2 metres |

$30$

EXHIBIT 3

Message 186630 Details
Subject: NOTICE OF ARRIVAL
Attachments:
Date: Thu, 09 Aug 2007 15:59:09
From: "Axinos" <Axinos@gtships.com>
To: <agency@silverstar.nl>, <opsdesk@projectorservices.co.uk>
CC: <tops@eagibson.co.uk>, <operations@imssa.gr>

To: Loading Terminal via Agent Silver Star
To: Projector Services Ltd
Cc: EA Gibson
Cc: IMS SA / OPS dept
Fm: Mt Axinos
Dd: 09.08.07
Ref: 638-07

Dear sirs,

This is to notify you that my undercommand vessel Mt Axinos arrived today 09.08.07 at Ijmuiden
pilot station

and anchored at 1445Hrs Lt awaiting laydays to commence.

This notice of arrival is tendered in accordance with all terms and conditions of CPDD 31.07.07

Brgds
Master

EXHIBIT 4

| 1. Agents | STANDARD TIME SHEET (SHORT FORM) RECOMMENDED BY THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE (BIMCO) AND THE FEDERATION OF NATIONAL ASSOCIATIONS OF SHIP BROKERS AND AGENTS (FONASBA) |
|---|---|

Page 2 of 2

| 2. Vessel's name | 3. Port |
|---|---|
| MTAXINOS | AMSTERDAM |

| 4. Owners/Disponent Owners | 5. Vessel berthed |
|---|---|
| CRUMBLE TRADING CORP. | |

| | 6. Loading commenced | 7. Loading completed |
|---|---|---|
| | Mon 13/08/2007 07:00 | Tue 14/08/2007 21:12 |

| 8. Cargo | 9. Discharging commenced | 10. Discharging completed |
|---|---|---|
| | 11. Cargo documents on board | 12. Vessel sailed |

| 13. Charter Party | 14. Working hours/meal hours of the port |
|---|---|
| ASBATANKVOY                31/07/2007 | |

| 15. Bill of Lading weight/quantity | 16. Outturn weight/quantity |  |
|---|---|---|
| 0.0000 | 0.0000 | |

| 17. Vessel arrived on roads / / | 18. Time to count from Mon 13/08/2007 07:00 |
|---|---|

| 19. Notice tendered / / | 20. Rate of demurrage (voyage) $ 20,000.00 | 21. Rate of despatch (voyage) $ 0.00 |
|---|---|---|

| 22. Next fda available | 23. Time to stop counting Tue 14/08/2007 21:12 |
|---|---|

| 24. Laytime allowed for loading  25. Laytime allowed for discharging  Total: 03 d 12 h 0 m | 26. Demurrage/Despatch Amount (voyage) Demurrage $ 1,054,388.89 |
|---|---|

LAYTIME COMPUTATION

| Date | Day | Time worked From | to | Laytime used days | hours | mins | On demurrage (voyage) days | hour | mins | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 13/08/2007 | Mon | 07:00 | 07:00 | | | | | | | Time to start counting |
| 13/08/2007 | Mon | 07:00 | 21:00 | | 17 | | | | | |
| 14/08/2007 | Tue | 00:00 | 21:12 | | 21 | 12 | | | | |
| 14/08/2007 | Tue | 21:12 | 21:12 | | | | | | | Time to stop counting |
| | | | | 1 | 14 | 12 | 1 | 21 | 48 | |

General remarks

| Place and date | Signature |
|---|---|
| Signature | Signature |

47

| 1. Agents | STANDARD TIME SHEET (SHORT FORM) RECOMMENDED BY THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE (BIMCO) AND THE FEDERATION OF NATIONAL ASSOCIATIONS OF SHIP BROKERS AND AGENTS (FONASBA) |
|---|---|

Page 2 of 3

| 2. Vessel's name MTAXINOS | 3. Port LOME |
|---|---|

| 4. Owners/Disponent Owners CRUMBLE TRADING CORP. | 5. Vessel berthed |
|---|---|

| | 6. Loading commenced | 7. Loading completed |
|---|---|---|

| 8. Cargo | 9. Discharging commenced Thu 30/08/2007 23:30 | 10. Discharging completed Wed 12/09/2007 23:00 |
|---|---|---|

| | 11. Cargo documents on board | 12. Vessel sailed |
|---|---|---|

| 13. Charter Party ASBATANKVOY      31/07/2007 | 14. Working hours/meal hours of the port |
|---|---|

| 15. Bill of Lading weight/quantity 0.0000 | 16. Outturn weight/quantity 0.0000 | |
|---|---|---|

| 17. Vessel arrived on roads / / | 18. Time to count from Thu 30/08/2007 23:30 |
|---|---|

| 19. Notice tendered / / | 20. Rate of demurrage (voyage) $ 20,000.00 | 21. Rate of despatch (voyage) $ 0.00 |
|---|---|---|

| 22. Next tide available | 23. Time to stop counting Wed 12/09/2007 23:00 |
|---|---|

| 24. Laytime allowed for loading | 25. Laytime allowed for discharging Total: 03 d 12 h 0 m | 26. Demurrage/Despatch Amount (voyage) Demurrage $ 1,054,388.89 |
|---|---|---|

LAYTIME COMPUTATION

| Date | Day | Time worked | | Laytime used | | | On demurrage (voyage) | | | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| | | From | to | days | hours | mins | days | hour | mins | |
| 30/08/2007 | Thu | 23:30 | 23:30 | | | | | | | Time to start counting |
| 30/08/2007 | Thu | 23:30 | 24:00 | | | 30 | | | | |
| 31/08/2007 | Fri | 00:00 | 24:00 | 1 | | | | | | |
| 01/09/2007 | Sat | 00:00 | 21:18 | | 21 | 18 | | | | |
| 01/09/2007 | Sat | 21:18 | 21:18 | | | | | | | Laytime Expired |
| 01/09/2007 | Sat | 21:18 | 24:00 | | 2 | 42 | | 2 | 42 | |
| 02/09/2007 | Sun | 00:00 | 24:00 | 1 | | | 1 | 2 | 42 | |
| 03/09/2007 | Mon | 00:00 | 24:00 | 1 | | | 2 | 2 | 42 | |
| 04/09/2007 | Tue | 00:00 | 24:00 | 1 | | | 3 | 2 | 42 | |
| 05/09/2007 | Wed | 00:00 | 24:00 | 1 | | | 4 | 2 | 42 | |
| 06/09/2007 | Thu | 00:00 | 24:00 | 1 | | | 5 | 2 | 42 | |
| 07/09/2007 | Fri | 00:00 | 24:00 | 1 | | | 6 | 2 | 42 | |
| 08/09/2007 | Sat | 00:00 | 24:00 | 1 | | | 7 | 2 | 42 | |
| 09/09/2007 | Sun | 00:00 | 24:00 | 1 | | | 8 | 2 | 42 | |
| 10/09/2007 | Mon | 00:00 | 24:00 | 1 | | | 9 | 2 | 42 | |
| 11/09/2007 | Tue | 00:00 | 21:18 | | 21 | 18 | 10 | 0 | 0 | |
| 11/09/2007 | Tue | 21:18 | 24:00 | | 2 | 42 | 10 | 2 | 42 | |
| 12/09/2007 | Wed | 00:00 | 12:03 | | 12 | 3 | 10 | 14 | 45 | |
| 12/09/2007 | Wed | 12:03 | 23:00 | | 10 | 57 | 11 | 1 | 42 | |
| 12/09/2007 | Wed | 23:00 | 23:00 | | | | 11 | 1 | 42 | Time to stop counting |
| | | | | 14 | 13 | 42 | -11 | -1 | -42 | |

43

| General remarks | |
| --- | --- |
| | |
| Place and date | Signature |
| Signature | Signature |
| | |

| 1.  Agents | **STANDARD TIME SHEET (SHORT FORM)**<br>RECOMMENDED BY THE BALTIC AND<br>INTERNATIONAL MARITIME CONFERENCE (BIMCO)<br>AND THE FEDERATION OF NATIONAL ASSOCIATIONS<br>OF SHIP BROKERS AND AGENTS (FONASBA) |
|---|---|
| | Page 2 of 3 |

| 2.  Vessel's name<br>MERXINOS | 3.  Port<br>LAGOS | |
|---|---|---|
| 4.  Owners/Disponent Owners<br>CRUMBLE TRADING CORP. | 5.  Vessel berthed | |
| | 6.  Loading commenced | 7.  Loading completed |
| 8.  Cargo | 9.  Discharging commenced<br>Thu 13/09/2007 16:00 | 10.  Discharging completed<br>Thu 25/10/2007 16:00 |
| | 11.  Cargo documents on board | 12.  Vessel sailed |
| 13.  Charter Party<br>ASBATANKVOY                          31/07/2007 | 14.  Working hours/next hours of the port | |
| 15.  Bill of Lading weight/quantity<br>0.0000 | 16.  Outturn weight/quantity<br>0.0000 | | |
| 17.  Vessel arrived on roads<br>/ / | 18.  Time to count from<br>Thu 13/09/2007 16:00 | |
| 19.  Notice tendered<br>/ / | 20.  Rate of demurrage (voyage)<br>$   20,000.00 | 21.  Rate of despatch (voyage)<br>$     0.00 |
| 22.  Next tide available | 23.  Time to stop counting<br>Thu 25/10/2007 16:00 | |
| 24.  Laytime allowed for loading     25.  Laytime allowed for discharging<br>Total: 03 d 12 h 0 m | 26.  Demurrage/Despatch Amount (voyage)<br>Demurrage $ 1,054,388.89 | |

LAYTIME COMPUTATION

| Date | Day | Time worked | | Laytime used | | | On demurrage (voyage) | | | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| | | From | to | days | hours | mins | days | hour | mins | |
| 13/09/2007 | Thu | 16:00 | 16:00 | | | | 11 | 1 | 42 | Time to start counting |
| 13/09/2007 | Thu | 16:00 | 24:00 | | 8 | | 11 | 9 | 42 | |
| 14/09/2007 | Fri | 00:00 | 24:00 | 1 | | | 12 | 9 | 42 | |
| 15/09/2007 | Sat | 00:00 | 24:00 | 1 | | | 13 | 9 | 42 | |
| 16/09/2007 | Sun | 00:00 | 24:00 | 1 | | | 14 | 9 | 42 | |
| 17/09/2007 | Mon | 00:00 | 24:00 | 1 | | | 15 | 9 | 42 | |
| 18/09/2007 | Tue | 00:00 | 24:00 | 1 | | | 16 | 9 | 42 | |
| 19/09/2007 | Wed | 00:00 | 24:00 | 1 | | | 17 | 9 | 42 | |
| 20/09/2007 | Thu | 00:00 | 24:00 | 1 | | | 18 | 9 | 42 | |
| 21/09/2007 | Fri | 00:00 | 12:00 | | 12 | | 18 | 21 | 42 | |
| 21/09/2007 | Fri | 12:00 | 24:00 | | 12 | | 19 | 9 | 42 | |
| 22/09/2007 | Sat | 00:00 | 24:00 | 1 | | | 20 | 9 | 42 | |
| 23/09/2007 | Sun | 00:00 | 01:15 | | 1 | 15 | 20 | 10 | 57 | |
| 23/09/2007 | Sun | 01:15 | 24:00 | | 22 | 45 | 21 | 9 | 42 | |
| 24/09/2007 | Mon | 00:00 | 24:00 | 1 | | | 22 | 9 | 42 | |
| 25/09/2007 | Tue | 00:00 | 24:00 | 1 | | | 23 | 9 | 42 | |
| 26/09/2007 | Wed | 00:00 | 24:00 | 1 | | | 24 | 9 | 42 | |
| 27/09/2007 | Thu | 00:00 | 24:00 | 1 | | | 25 | 9 | 42 | |
| 28/09/2007 | Fri | 00:00 | 24:00 | 1 | | | 26 | 9 | 42 | |
| 29/09/2007 | Sat | 00:00 | 24:00 | 1 | | | 27 | 9 | 42 | |
| | | | | 30 | 21 | 42 | -27 | -9 | -42 | |



45

LAYTIME COMPUTATION

Page 3 of 3

| Date | Day | Time worked | | Laytime used | | | On demurrage (voyage) | | | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| | | From | to | days | hours | mins | days | hour | mins | |
| 30/09/2007 | Sun | 00:00 | 24:00 | 1 | | | 28 | 9 | 42 | |
| 01/10/2007 | Mon | 00:00 | 24:00 | 1 | | | 29 | 9 | 42 | |
| 02/10/2007 | Tue | 00:00 | 24:00 | 1 | | | 30 | 9 | 42 | |
| 03/10/2007 | Wed | 00:00 | 01:15 | | 1 | 15 | 30 | 10 | 57 | |
| 03/10/2007 | Wed | 01:15 | 24:00 | | 22 | 45 | 31 | 9 | 42 | |
| 04/10/2007 | Thu | 00:00 | 24:00 | 1 | | | 32 | 9 | 42 | |
| 05/10/2007 | Fri | 00:00 | 24:00 | 1 | | | 33 | 9 | 42 | |
| 06/10/2007 | Sat | 00:00 | 24:00 | 1 | | | 34 | 9 | 42 | |
| 07/10/2007 | Sun | 00:00 | 24:00 | 1 | | | 35 | 9 | 42 | |
| 08/10/2007 | Mon | 00:00 | 24:00 | 1 | | | 36 | 9 | 42 | |
| 09/10/2007 | Tue | 00:00 | 24:00 | 1 | | | 37 | 9 | 42 | |
| 10/10/2007 | Wed | 00:00 | 24:00 | 1 | | | 38 | 9 | 42 | |
| 11/10/2007 | Thu | 00:00 | 24:00 | 1 | | | 39 | 9 | 42 | |
| 12/10/2007 | Fri | 00:00 | 24:00 | 1 | | | 40 | 9 | 42 | |
| 13/10/2007 | Sat | 00:00 | 01:15 | | 1 | 15 | 40 | 10 | 57 | |
| 13/10/2007 | Sat | 01:15 | 24:00 | | 22 | 45 | 41 | 9 | 42 | |
| 14/10/2007 | Sun | 00:00 | 24:00 | 1 | | | 42 | 9 | 42 | |
| 15/10/2007 | Mon | 00:00 | 24:00 | 1 | | | 43 | 9 | 42 | |
| 16/10/2007 | Tue | 00:00 | 24:00 | 1 | | | 44 | 9 | 42 | |
| 17/10/2007 | Wed | 00:00 | 24:00 | 1 | | | 45 | 9 | 42 | |
| 18/10/2007 | Thu | 00:00 | 24:00 | 1 | | | 46 | 9 | 42 | |
| 19/10/2007 | Fri | 00:00 | 24:00 | 1 | | | 47 | 9 | 42 | |
| 20/10/2007 | Sat | 00:00 | 24:00 | 1 | | | 48 | 9 | 42 | |
| 21/10/2007 | Sun | 00:00 | 14:16 | | 14 | 16 | 48 | 23 | 58 | |
| 21/10/2007 | Sun | 14:16 | 19:42 | | | | 48 | 23 | 58 | SHIFTING TO BERTH/NTC |
| 21/10/2007 | Sun | 19:42 | 24:00 | | 4 | 18 | 49 | 4 | 16 | |
| 22/10/2007 | Mon | 00:00 | 24:00 | 1 | | | 50 | 4 | 16 | |
| 23/10/2007 | Tue | 00:00 | 01:15 | | 1 | 15 | 50 | 5 | 31 | |
| 23/10/2007 | Tue | 01:15 | 24:00 | | 22 | 45 | 51 | 4 | 16 | |
| 24/10/2007 | Wed | 00:00 | 24:00 | 2 | | | 52 | 4 | 16 | |
| 25/10/2007 | Thu | 00:00 | 11:39 | | 11 | 39 | 52 | 15 | 55 | HOSES DISCON./AWAIT.CARGO DOCS |
| 25/10/2007 | Thu | 11:39 | 14:39 | | | | 52 | 15 | 55 | |
| 25/10/2007 | Thu | 14:39 | 15:00 | | 1 | 21 | 52 | 17 | 16 | |
| 25/10/2007 | Thu | 16:00 | 16:30 | | | | 52 | 17 | 16 | Time to stop counting |
| | | | | 56 | 5 | 16 | -52 | -17 | -16 | |

General remarks

| Place and date | Signature |
|---|---|
| Signature | Signature |

EXHIBIT 5

# CRUMBLE TRADING CORP.
# LIBERIA

Messrs, PROJECTOR S.A. of Belize
C/O EA GIBSON                                    Piraeus, 26th October 2007

### MT AXINOS– ACNT PROJECTOR CPDD 31.07.07
### PROVISIONAL FINAL DEMURRAGE INVOICE

-Demurrage (as per attached time sheet):
Days 52.71944 x USD 20,000PD                           1,054,388.89

-Less 1.25% address commission:                          (-13,179.86)
-Less 1.25% commission to Navig Europe:                  (-13,179.86)
-Less remittance received on 18.09/                     (-195,000.00)
                          on 26.09/                     (-195,000.00)
                          on 05.10/                     (-195,000.00)
                          on 17.10/                     (-195,000.00)
                          on 25.10/                     (-195,000.00)
                                                        ─────────────

                        Balance due to Owners USD 53,029.17

Remittance to be effected to:
H S B C BANK PLC
PIRAEUS BRANCH
93, AKTI MIAOULI GR – 185 38
SWIFT ADD: MIDLGRAA
PIRAEUS – GREECE
A/C NO: 001 076 348036
F/O: CRUMBLE TRADING CORP.
UNDER REF: AXINOS / ADDAX
TLX NO: 211788 MIDP GR



Yours faithfully
CRUMBLE TRADING CORP.

47